Terry WHITE, et al., Plaintiff(s),

v.

The INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA,
Defendant(s).

No. 5:02 CV 0999.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 5, 2003.

Robert E. Kerper, Jr., Akron, OH, for Plaintiffs.

Devin J. Oddo, Steven G. Janik, Kathleen A. Nitschke, Matthew J. Grimm, Michael J. Callow, Janik & Dorman, LLP, Kathryn A. Kerka, Rodgers And Co., L.P.A., Cleveland, OH, for Defendant.

### MEMORANDUM OPINION

DOWD, District Judge.

Before the Court are cross-motions for summary judgment with supporting documentation. (Doc. Nos. 31, 34).[1] On May 27, 2003, the Court heard oral arguments on the dispositive motions[2] and then asked counsel to file supplemental briefs regarding the potential applicability of the Motor Carrier Act, an issue which first arose during the oral arguments. These supplemental briefs have been filed (Doc. No. 57, with Nos. 59–60; Doc. Nos. 62, 67, 68, and 69). The defendant has also filed a motion to stay all proceedings (Doc. No. 58, supported by No. 60), which plaintiffs have opposed (Doc. No. 61).

For the reasons set forth below, plaintiffs' motion for summary judgment (Doc. No. 34) is denied and defendant's motion for summary judgment (Doc. No. 31) is granted. Defendant's motion to stay (Doc. No. 58) is denied.

### I. BACKGROUND

On May 29, 2002, defendant, The Insurance Company of the State of Pennsylvania (ISOP), removed the above-captioned action from the Court of Common Pleas of Summit County, Ohio on the basis of diversity of citizenship.[3] The complaint, brought by Terry White and Melissa White on behalf of themselves and their three minor children, seeks a declaratory judgment with respect to the various par-

---

1. Defendant's motion (Doc. No. 31) is supported by several exhibits (Doc. Nos. 32, 53). Plaintiffs' response to the motion is Doc. No. 33.

   Plaintiffs' cross-motion (Doc. No. 34) is also supported by several exhibits (Doc. No. 36). Defendant's response to the cross-motion is Doc. No. 40, with exhibits at Doc. No. 41. Plaintiff also filed a reply brief. (Doc. No. 44).

2. Prior to the argument, the Court issued a Proposed Memorandum Opinion, which was placed under seal. *See* Doc. No. 48.

3. On June 4, 2002, the Court directed ISOP to show cause why the case should not be remanded under the authority of *Kormanik v. St. Paul Fire & Marine Ins. Co.*, 208 F.Supp.2d 824 (N.D.Ohio 2001), which held that, because so-called *Scott–Pontzer* claims are "direct actions" under the diversity-limiting provision of 28 U.S.C. § 1332(c)(1), an insurance company takes on the citizenship of its insured which often destroys diversity. By order dated July 8, 2002, the Court noted that defendant had satisfactorily shown that there is diversity here, notwithstanding *Kormanik*, because, since the employer is an out-of-state corporation, adopting the employer's citizenship does not destroy diversity. Therefore, remand was not appropriate.

   The Court notes that the Sixth Circuit has since ruled that *Scott–Pontzer* claims are *not* "direct actions." *Lee–Lipstreu v. Chubb Group of Ins. Cos.*, 329 F.3d 898 (6th Cir. 2003). As it turns out, *Lee–Lipstreu* has no direct bearing on this case, notwithstanding this Court's earlier adoption of the now-overruled view expressed by *Kormanik*.

ties' rights under certain insurance policies. The relief sought is based upon essentially undisputed facts. Resolution of the instant motions requires conclusions of law regarding the proper interpretation of the relevant insurance policy or policies in light of Ohio law.

On or about August 6, 1997, plaintiff Terry White was employed by Preston Trucking ("Preston") in Brecksville, Ohio. On that day, while operating a tow motor in the course and scope of his employment, Terry White was involved in an accident with another company employee operating a tractor-trailer in the course and scope of his employment.[4] Terry White suffered severe, disabling, and permanent physical injuries and incurred significant expenses. His wife and children bring separate claims for loss of consortium.

The plaintiffs seek uninsured/underinsured motorist (UM/UIM) coverage under a commercial automobile liability policy of insurance issued to Preston by ISOP.[5] They seek recovery of the policy limits, asserting that there was no valid rejection of UM/UIM coverage as required by Ohio

law. In the alternative and for the same reason, plaintiffs claim a right to UM/UIM coverage under a motor carrier's excess indemnity policy which was also effective at the relevant time. In their supplemental brief, plaintiffs advance the argument that, because of the MCS–90 Endorsement mandated by the Motor Carrier Act of 1980, which is part of the excess policy, that layer of insurance is, in fact, a "motor vehicle liability policy" subject to the UM/UIM requirements.

ISOP argues that Preston is self-insured, in the practical sense, and not subject to the offer and rejection requirements of O.R.C. § 3937.18 with respect to the UM/UIM coverage. It asserts that the two policies are really one and, for that reason, the "excess" layer escapes application of *Dolly v. Old Republic Ins. Co.*, 200 F.Supp.2d 823 (N.D.Ohio 2002).[6] In the alternative, ISOP argues that only Terry White, and none of the other plaintiffs, is an "insured" under the relevant policies. In response to plaintiffs' supplemental argument, ISOP asserts that the MCS–90 Endorsement does not convert the excess

---

**4.** Terry White was operating a tow motor at Preston's facilities in Richfield, Ohio. A tow motor is "a vehicle similar to a fork lift that is used to move very heavy objects." *Flynn v. Herbert E. Orr Co., Inc.*, No. 11–02–04, 2002 WL 31716333, at *1, n. 2 (Ohio App. 3 Dist. Dec. 4, 2002). White was unloading a tractor-trailer parked at the loading dock. The driver of the tractor, unaware that White was still in the trailer on his tow motor, pulled away from the dock. The sudden movement hurled Terry White out of the trailer and onto the cement dock. (Cross–Motion at 10).

**5.** Strictly speaking, plaintiffs seek only uninsured coverage. The complaint alleges that the employee operating the tractor-trailer "was an uninsured motorist." (Compl.¶ 11). ISOP does not challenge this particular assertion. Under concepts developed in the worker's compensation arena, since the tortfeasor here was a co-worker of Terry White, immunity exists; that is, White could not attempt to

recover directly from Preston or from the co-worker. Under the version of O.R.C. § 3937.18 that was in effect at the time of the accident, "[t]he fact that the owner or operator of the uninsured motor vehicle has an immunity, whether based upon a statute or the common law, that could be raised as a defense in an action brought against him by the person insured under uninsured motorist coverage does not affect the insured person's right to recover under his uninsured motorist coverage." For that reason, the tortfeasor is deemed to be "uninsured."

**6.** In *Dolly*, this Court held, with respect to an excess/umbrella policy of liability insurance, that UM/UIM coverage was implied by operation of law, that the retained limits which applied to the liability coverage of the policy did not apply to the UM/UIM coverage, and that the excess/umbrella policy "dropped down" to pick up where the primary layer of insurance left off. 200 F.Supp.2d at 840–42.

indemnity policy into a motor vehicle liability policy that must comply with § 3937.18.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)). Further, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. *See also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir.2003) ("[t]he conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

## III. DISCUSSION

### A. The Parties' Arguments

Dispositive of this entire case is the interpretation of what ISOP refers to as "The Preston Risk Management Program." ISOP describes the Program as follows:

The Preston Risk Management Program ("Program") is comprised of Excess Indemnity Policy No. TXT 2712212 (Ex. 1), having liability limits of $3 million excess of a $2 million SIR [Self–Insured Retention], the automobile liability coverage subpart ("CA Subpart") (Ex. 2) in which Preston manifested its intent to reject UM/UIM coverage in those states where permitted, and the corresponding Self–Insured Retention Agreement ("SIR") (Ex. 3).[2]

2 Endorsement # 13 of the Excess Indemnity Policy No. TXT 2712212 incorporates the SIR in its entirety to the CA Subpart. (Ex. 4).

The CA Subpart was issued solely to manifest Preston's intent to reject UM/UIM coverage in states where such rejection is permitted, including Ohio. Preston intended to reject UM/UIM coverage in the State of Ohio under the Preston Policy and manifested this intent by having Preston representative, Donald Hansen, signed [sic] ISO Form No. 62582, titled "Rejection of Uninsured Motorist/Underinsured Motorist Coverage for Selection of Lower Limits of Liability (Ohio)" ("Rejection Form") (Ex. 5). See Affidavit of Cathy Wilson, Risk Manager for Yellow Corporation and Underwriter Hodges Bradberry [footnote 3 omitted] (Ex. 6).

(ISOP's Motion at 3; footnote 2 in original).[7] In other words, ISOP's position is that both policies must be read together as one "self-insurance" policy which, under this Court's and Ohio courts' precedent, is not subject to the offer/rejection requirements of § 3937.18. ISOP argues that "[u]nder [the] Program, ISOP 'fronts' motor vehicle liability protection for Preston and, in turn, Preston reimburses ISOP for up to One Hundred Percent (100%) of its SIR for any losses paid under the Policy as prescribed by the [Self–Insured Retention] Agreement." ISOP's Motion at 5.

Plaintiffs assert that there are two policies, rather than the one "Program" advanced by ISOP, namely, a primary motor vehicle liability policy (TP2713829RA) and an excess liability policy (TXT2712212). Terry White argues that, under the primary policy, he is "entitled to uninsured motorist coverage equal to the policy limits, whatever they are" (Cross–Motion at 7), because Preston's alleged "rejection" of UM/UIM coverage, which is undated (*see* Doc. No. 32, Exh. 5), does not meet the requirements for rejection of coverage set forth in *Linko v. Indemnity Ins. Co. of N. America,* 90 Ohio St.3d 445, 739 N.E.2d 338 (2000). Plaintiffs argue that UM/UIM coverage equal to the liability coverage is, therefore, impressed upon the primary policy by operation of law. They further argue, relying on *Dolly, supra,* that they are similarly entitled to UM/UIM coverage by operation of law under the excess policy in the amount of the $1 million for which ISOP is responsible (beyond the $2 million self-retained "deductible"). To buttress this last argument, plaintiffs argue that the MCS–90 Endorsement attached to the excess policy converts that indemnity policy into a motor vehicle liability policy.

## B. Analysis of Claims

### 1. The Insurance Claims

Under the Ohio statute in effect at the relevant time, i.e., August 6, 1997, when entering into a contract of insurance for automobile or motor vehicle liability coverage, insurers were required to offer insureds both uninsured motorist ("UM") and underinsured motorist ("UIM") coverage equivalent to the automobile liability or motor vehicle liability coverage in the policy. O.R.C. § 3937.18(A)(1) and (2).[8]

---

7. The Court notes that Exhibit 5, referenced in the second paragraph of the quoted text, is an undated document and, as such, has little value as evidence for purposes of summary judgment.

8. The Court must apply the statutory version in effect at the time of the parties' contract because subsequent statutory amendments have not expressly been made retroactive. *Ross v. Farmers Ins. Group,* 82 Ohio St.3d 281, 695 N.E.2d 732 (1998) (syllabus).

As of August 6, 1997, the date of the accident, the Ohio statute provided in relevant part as follows:

(A) No automobile liability or motor vehicle liability policy of insurance insuring against loss resulting from liability imposed

Failure to do so would result in the insured acquiring UM/UIM coverage by operation of law. *Abate v. Pioneer Mut. Cas. Co.*, 22 Ohio St.2d 161, 163, 258 N.E.2d 429 (1970). Although the statute permitted the insured to reject an offer of UM/UIM coverage, the burden was on the insurance company to show that any such rejection was made expressly and knowingly. *Id.* The Ohio Supreme Court has held that one cannot ascertain whether there has been an express and knowing rejection unless both the offer and the rejection are in writing. *Gyori v. Johnston Coca–Cola Bottling Group, Inc.*, 76 Ohio St.3d 565, 567–68, 669 N.E.2d 824 (1996). That court has also held that to satisfy the offer requirement, "the insurer must inform the insured of the availability of UM/UIM coverage, set forth the premium for UM/UIM coverage, include a brief description of the coverage, and expressly state the UM/UIM coverage limits in its offer[.]" *Linko v. Indemnity Ins. Co. of North America*, 90 Ohio St.3d 445, 447–48, 739 N.E.2d 338 (2000). All of these requirements apply to both primary and excess liability insurance

policies. *Duriak v. Globe Am. Cas. Co.*, 28 Ohio St.3d 70, 72, 502 N.E.2d 620 (1986).

■ One notable exception to the offer requirement of § 3937.18 is the case of self-insurance. As this Court discussed in *Dolly:*

> ... [*Grange Mut. Cas. Co. v. Refiners Transport & Terminal Corp.*, 21 Ohio St.3d 47, 487 N.E.2d 310 (1986)] adopted the result reached by the Court of Appeals for Summit County in *Snyder v. Roadway Express, Inc.*, 7 Ohio App.3d 218, 455 N.E.2d 11 (1982), which held that the UM/UIM requirements of § 3937.18 as it was then constituted were not intended to apply to self-insurers. *Refiners Transport* stated: "The [*Snyder*] court recognized ... that if the statute did apply to self-insurers, in addition to insurance carriers authorized to write motor vehicle liability insurance policies, it would result in the absurd situation where one has the right to reject an offer of insurance to ones' self [sic] ...; [and] even if applicable, we believe the insured's rejection must be presumed." 21 Ohio St.3d at 48–49, 487 N.E.2d at 312 (internal quotation marks

by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless both of the following coverages are provided to persons insured under the policy for loss due to bodily injury or death suffered by such persons:

(1) Uninsured motorist coverage, which shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage ....

(2) Underinsured motorist coverage, which shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage ....

(B) Coverages offered under division (A) of this section shall be written for the same limits of liability. No change shall be made in the limits of one of these coverages with-

out an equivalent change in the limits of the other coverage.

(C) The named insured may only reject or accept both coverages offered under division (A) of this section.... Unless the named insured requests such coverages in writing, such coverages need not be provided in or supplemental to a renewal policy where the named insured has rejected the coverages in connection with a policy previously issued to him by the same insurer. If the named insured has selected uninsured motorist coverage in connection with a policy previously issued to him by the same insurer, such coverages offered under division (A) of this section need not be provided in excess of the limits of the liability previously issued for uninsured motorist coverage, unless the named insured requests in writing higher limits of liability for such coverages.

and citations omitted). The *Refiners Transport* court explained that, although the employer's purchase of a surety bond and two excess insurance policies to meet its financial responsibility requirements did not make it a self-insurer *"in the legal sense* contemplated by R.C. 4509.45(D) and 4509.72," *id.* (emphasis added), it did make the employer a self-insurer *"in the practical sense* in that Refiners was ultimately responsible under the term of its bond either to a claimant or the bonding company in the event the bond company paid any judgment claim." *Id.* (emphasis added). The court ultimately concluded that "[a]lthough public policy may well favor mandatory uninsured motorist protection for employees of self-insured employers, such a declaration must emanate from Ohio's General Assembly." *Id.* at 50, 487 N.E.2d 310. The court held "that the uninsured motorist provisions of R.C. 3937.18 do not apply to either self-insurers or financial responsibility bond principals." *Id.* at 51, 487 N.E.2d 310.

*Dolly,* 200 F.Supp.2d at 836.[9]

In the instant case, there are three documents which the Court must consider in the light of the above case law: two policies (No. TP2713829RA and No. TXT2712212) and a Self–Insured Retention Agreement ("SIR Agreement") between Preston and ISOP. Defendant argues that this is all one "practical self-insurance" program not subject to O.R.C. § 3937.18.[10] Plaintiffs ignore the SIR Agreement and argue that the both policies include UM/UIM coverage by operation of law: the first for failure to comply with the offer/rejection requirements of § 3937.18 as it has been interpreted by courts, and the second under the teachings of *Dolly.*

In order to understand the nuances of the two insurance documents at issue here and, for that matter, much of the case law,

9. Put simply, applying a later version of § 3937.18 than is at issue in the instant case, this Court concluded in *Dolly* that the primary liability insurance, a so-called "matching deductible" arrangement under which the insured assumed all the risk of loss, was "self-insurance" and not subject to the UM/UIM requirements of § 3937.18, and that the UM/UIM coverage in the excess liability policy, which the parties agreed was impressed upon the policy by operation of law, was not subject to the retained limit in the liability portion of the policy.

10. The Court notes that ISOP's very first argument is that plaintiffs cannot recover in any event because they have not supplied "independent corroborative evidence to prove the alleged negligence of the tortfeasor." (ISOP's Motion at 3). As authority for this assertion, ISOP points to *Girgis v. State Farm Mut. Auto. Ins. Co.,* 75 Ohio St.3d 302, 662 N.E.2d 280 (1996). The Court rejects this argument out of hand with no further analysis. *Girgis* was a case where the plaintiff was injured after she lost control of her car when an unidentified (or phantom) car swerved into her lane of traffic. The *Girgis* court held that public policy precluded contract provisions in insurance policies which would require actual physical contact as a prerequisite to recovery under the UM coverage provision. It further ruled that "the test to be applied in cases where an unidentified driver's negligence causes injury is the corroborative evidence test, which allows the claim to go forward if there is independent third-party testimony that the negligence of an unidentified vehicle was a proximate cause of the accident." *Id.,* Syllabus ¶ 2. In *Girgis,* the tortfeasor was not only *unidentified;* he or she was *unidentifiable.* Here, plaintiff Terry White certainly knows the identity of the employee who was driving the other vehicle involved in the accident, even though there is no name given in the Complaint. At his deposition, Terry White identified the other driver as Chuck Keller. White Dep. at 21. To bar plaintiff's claim because Keller is not named in the Complaint (so as to construe the other driver as "unidentified" within the meaning of *Girgis* ) would exalt form over substance, especially since the Complaint could easily be amended.

one must be sensitive to many terms of art and take care to apply the policies according to these terms.[11] BLACK'S LAW DICTIONARY (7th ed.) defines the various terms that have general relevance to the issues involved in the instant case.

"Comprehensive" insurance "combines coverage against many kinds of losses that may also be insured separately. This is commonly used, for example, in an automobile-insurance policy." *Id.* at 803. Comprehensive insurance is typically "primary" insurance, that is, "[i]nsurance that attaches immediately on the happening of a loss [which] is not contingent on the exhaustion of an underlying policy." *Id.* at 807.

By contrast, "excess" insurance is "[a]n agreement to indemnify against any loss that exceeds the amount of coverage under another policy." *Id.* at 804. In other words, the designations "primary" and "excess" reveal the *order* in which the policies will provide coverage. The primary policy, as its name suggests, goes first and pays to its limits before the excess (or "secondary") policy is triggered.[12]

Insurance is also labeled according to the *nature of the loss* it covers. "Liability" insurance constitutes "an agreement to cover a loss resulting from one's liability to a third party, such as a loss incurred by a driver who injures a pedestrian." *Id.* at 806. The claim under the policy "arises once the insured's liability to a third party has been asserted." *Id.*

In contrast to this "third-party insurance," there is also "indemnity" insurance which is characterized as "first-party insurance" and defined as "[a] policy that applies to oneself or one's own property, such as life insurance, health insurance, disability insurance, and fire insurance." *Id.* at 804.

Both primary insurance and excess insurance can be either liability insurance or indemnity insurance. A person can be covered by both primary liability insurance and excess liability insurance. Neither insurance is triggered until the insured becomes *liable* for losses suffered by a third party. The excess insurance will not be triggered until the primary insurance is exhausted. This scenario describes the typical person's automobile liability coverage, including UM/UIM coverage.

Similarly, indemnity insurance, which protects the insured in case of his or her own loss, can be either primary or excess in nature. Where the insured actually incurs a loss, the primary indemnity insurer will indemnify that loss and the excess indemnity insurer will step in with coverage only after the primary coverage is exhausted.

■ One must remember that § 3937.18 does not apply to *every* insurance policy, but only to liability policies which are intended to serve as proof of financial re-

---

11. Insurance is a contract. Under contract law, a court must look to the language of the relevant policies (i.e., contracts) and "construe [them] so as to give effect to the intention as expressed by the language of the parties [but not] ... extend[ ] or enlarge[ ] by implication to embrace an object distinct from that originally contemplated[.]" *Stickel v. Excess Ins. Co. of America,* 136 Ohio St. 49, 23 N.E.2d 839 (1939), syllabus ¶ 1. Unless proof to the contrary is offered, this Court must accept as true that the parties to the insurance contracts at issue here understood the terms of art used in the contracts. Therefore, this Court must construe those terms so as to give them the meanings the parties understood them to have.

12. Excess insurance is sometimes confused with "umbrella" insurance which "cover[s] losses that exceed the basic or usual limits of liability provided by other policies." (BLACK'S LAW DICTIONARY, at 811). Umbrella insurance is, of course, excess in the sense that it is not triggered until the limits of all other insurances are tapped out.

sponsibility for owners and operators of motor vehicles—a prerequisite to legally driving a motor vehicle in Ohio. In other words, § 3937.18 does not apply to *indemnity* policies, even if those policies happen to mention motor vehicles.[13]

■ In this case, there are two insurance documents: Policy No. TP2713829RA, which is a commercial automobile *liability* policy, and Policy No. TXT2712212, which is a motor carrier's excess *indemnity* policy. The declarations page for TP2713829RA (which ISOP refers to as the "CA subpart" of the Program) does not specify a premium amount. Instead, the estimated total premium is identified as "incl. in TXT2712212." The premium for TXT2712212 is $580,080.00. In other words, for the single policy premium amount, Preston obtained both auto liability coverage and excess indemnity coverage.[14]

As defendant properly argues, Policy No. TP2713829RA is indeed a "fronting" policy[15] whereby ISOP "fronts" motor vehicle liability protection for Preston. Under the terms of a Self–Insured Retention Agreement described in more detail below, Preston reimburses ISOP for up to 100% of its self-insured retention ("SIR") of $2 million for any losses paid under TP2713829RA. Under Policy No. TXT2712212, the excess indemnity policy, if Preston has losses which exceed its $2 million SIR, ISOP will indemnify Preston up to a total amount of $3 million. In other words, ISOP bears a risk that it will have to indemnify Preston up to $1 million.

This "split" arrangement is set forth in both TXT2712212 and the Self–Insured Retention Agreement ("the Agreement") between Preston and ISOP. (Doc. No. 32, Exh. 3). Although the Agreement contains many details relating to the respec-

---

**13.** In 1998, § 3937.18 was amended to add several clarifying sections, including the following:

(L) As used in this section, "automobile liability or motor vehicle liability policy of insurance" means either of the following:

(1) Any policy of insurance that serves as proof of financial responsibility, as proof of financial responsibility is defined by division (K) of section 4509.01 of the Revised Code, for owners or operators of the motor vehicles specifically identified in the policy of insurance;

(2) Any umbrella liability policy of insurance.

As this Court noted in *Dolly:*

at least one intent of subsection (L)(1) is not to establish that self-insurance is subject to the UM/UIM offering requirement, but rather to differentiate between actual automobile/motor vehicle liability policies and other kinds of general policies which may arguably sweep into their coverage injuries resulting from accidents involving various motorized vehicles (such as recreational vehicles not intended for use on public highways). *See, e.g., Davidson v. Motorists Mut. Ins. Co.,* 91 Ohio St.3d 262, 744 N.E.2d 713 (2001) (construing the law in effect prior to Sept. 3, 1997; reversing both the trial and appeal courts' holding that a homeowner's policy provided coverage for vehicles not subject to vehicle registration).

*Dolly v. Old Republic Ins. Co.,* 200 F.Supp.2d at 838.

**14.** Indemnity was provided for nine classifications of coverage: (A) personal injury; (B) property damage; (C) UM/UIM; (D) personal injury protection; (E) cargo legal liability; (F) comprehensive loss to covered vehicles; (G) physical damage as a result of collision; (H) workers' compensation/occupation disease where qualified as a self-insurer; and (I) employers' liability. For the last category, when the insured was not a qualified self-insurer, it was required to carry primary insurance of $1 million per occurrence. (Doc. No. 32, Exh. 1, declarations).

**15.** As explained by the court in *McCollum v. Continental Ins. Co.,* No. L–92–141, 1993 WL 382455 (Ohio App. Apr. 9, 1993), a "fronting agreement" is "an insurance term indicating that an entity is renting an insurance company's licensing and filing capabilities in a particular state or states." *Id.* 1993 WL 382455, at *3.

tive rights and duties of the parties, only a few merit mention here. Under the Agreement, Preston is required to establish a "reserve" for each claim as soon as a loss becomes known. The amount of the reserve is defined in the Agreement. Preston must also make regular reports to ISOP with respect to the reserve. (Agreement, pp. 2–3). Preston "retain[s] primary responsibility to investigate, adjust, defend at its own expense and satisfy liability for losses up to the dollar amount specified in the SIR Endorsement." (*Id.*, p. 2, ¶ D).[16] Preston is not, however, allowed to pay any claim greater than $2 million without authorization from ISOP. (*Id.*, p. 4, ¶ 2a). Under certain circumstances, e.g., where the reserve is greater than the SIR, ISOP must "respond to, investigate, adjust, defend and dispose of by payment or otherwise all losses and claims for losses covered by the Policy[,]" (*id.*, ¶ 2b), even though Preston is still required to pay the portion of the loss which is within its SIR. Preston is also required to maintain a certain defined "security" with ISOP to insure performance of Preston's obligations under the Agreement. (*Id.*, p. 6, ¶ 3a).

In view of the above, the Court agrees with the defendant that these three documents constitute *one* policy, a comprehensive-type policy, with a segment providing commercial auto liability coverage, as required by most states, and another segment providing indemnity when Preston's losses exceed the SIR. Under this arrangement, Preston is self-insured for purposes of automobile liability coverage (and

"rents" ISOP's insurance license, *see McCollum*, n. 15 *supra* ), but it retains the ability to recover (for *itself*, not for any injured third party) up to $1 million of any catastrophic loss that it becomes liable to pay. Because it is self-insured with respect to the automobile liability coverage, § 3937.18 does not apply to Policy No. TP2713829RA and no UM/UIM coverage is available to Terry White. Because TXT2712212 is an *indemnity* policy intended to protect Preston, not a *liability* policy intended to prove financial responsibility for automobile-related injuries to third parties, § 3937.18 does not apply and there is no UM/UIM coverage available.

The parties here both rely on *Dolly* and *McCollum*, each claiming that both cases support their respective positions. However, *Dolly* and *McCollum* are distinguishable from the instant case because they both involved interpretation of two *liability* policies, one primary and one excess. Here there is one self-insured liability policy which contains an indemnity provision for losses in excess of the SIR.[17]

As for the plaintiffs' belated argument that the MCS–90 endorsement attached to TXT2712212 converts that excess indemnity policy into a motor vehicle liability policy which then has UM/UIM coverage impressed upon it by operation of law, the Court finds no support for this view in the case law. Courts have discussed the relevance of this endorsement but usually in a context where there is some question of *risk allocation* among insurers, not in the context of coverage questions.[18]

---

**16.** The Agreement further indicates that "[t]he premium due under the Policy is reduced on account of the assumption of liability by the Insured pursuant to the SIR Endorsement." (Agreement, p. 2, ¶ E).

**17.** Even if the Court were to conclude that there were two policies, the result would be the same: the automobile liability policy, as self-insurance, would not be subject to

§ 3937.18, and the indemnity policy, which is not an auto liability policy serving as proof of financial responsibility, would also not be subject to the statute.

**18.** The Sixth Circuit has identified "three basic views on how [MCS–90] endorsement affects the allocation of risk between insurers" as follows:

Understanding the relevance of the MCS–90 endorsement when it is contained in a policy of insurance requires some understanding of the purpose of the endorsement. In *Prestige Casualty Co. v. Michigan Mutual Insurance Co.*, 99 F.3d 1340 (6th Cir.1996), the court noted:

> ... Historically ... [u]nscrupulous ICC-licensed [motor] carriers would used leased vehicles to avoid safety regulations governing equipment and drivers. *American Trucking*, 344 U.S. at 305, 73 S.Ct. at 312. Authorized carriers' use of non-owned vehicles also caused public confusion as to who was financially responsible for the vehicles. *Empire Fire*, 868 F.2d at 362; *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473, 477 (3d Cir.1961).
>
> ... (1) the ICC endorsement makes the insurance policy to which it is attached primary as a matter of law over all other insurance policies that lack similar provisions, *see, e.g., Integral Ins. Co. v. Lawrence Fulbright Trucking, Inc.*, 930 F.2d 258 (2d Cir.1991); (2) the ICC endorsement only negates limiting provisions in the policy to which it is attached, but does not establish primary liability over other policies that are also primary by their own terms, *see, e.g., Empire Fire*, 868 F.2d at 361–62; *American Gen. Fire & Cas. Co. v. Truck Ins. Exchange*, 660 F.Supp. 557 (D.Kan.1987); *Transport Indem. Co. v. Carolina Cas. Ins. Co.*, 133 Ariz. 395, 652 P.2d 134 (1982); *Zurich–American Ins. Co. v. Amerisure Ins. Co.*, 215 Mich.App. 526, 547 N.W.2d 52 (1996); and (3) the ICC endorsement applies only to situations in which a claim is being asserted by a shipper or member of the public, and has no application as among insurers. *See, e.g., Occidental Fire & Casualty Co. v. Int'l Ins. Co.*, 804 F.2d 983, 986 (7th Cir.1986); *Carter v. Vangilder*, 803 F.2d 189, 192 (5th Cir.1986); *Travelers Ins. Co. v. Transport Ins. Co.*, 787 F.2d 1133, 1140 (7th Cir. 1986); *Grinnell Mut. Reinsurance Co. v. Empire Fire & Marine Ins. Co.*, 722 F.2d 1400 (8th Cir.1983); *Transport Indem. Co. v. Paxton Nat'l Ins. Co.*, 657 F.2d 657 (5th Cir.1981)(Unit A); *Carolina Casualty Ins. Co. v. Ins. Co. of North America*, 595 F.2d

To right these wrongs, Congress amended the Interstate Commerce Act to allow the ICC to promulgate regulations governing all aspects of the non-owned equipment by authorized carriers.... ICC regulations now require that ... all authorized carriers must maintain insurance or other form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles" under the carrier's license. 49 C.F.R. § 1043.1(a) (1995).

*Id.* at 1342–43; [19] *see also Canal Ins. Co. v. Distribution Services, Inc.*, 320 F.3d 488, 490 (4th Cir.2003) ("It is well-established that the primary purpose of the MCS–90 128, 138 (3rd Cir.1979); *Truck Ins. Exchange v. Transport Indem. Co.*, 180 Mont. 419, 591 P.2d 188 (1979).

*Prestige Casualty Co. v. Michigan Mutual Ins. Co.*, 99 F.3d 1340, 1348 (6th Cir.1996). The district court in *Prestige* had adopted the third view, which the Sixth Circuit rejected based on Michigan law, which the court believed favored the second approach. *See, id.* at 1348–49 (discussing Michigan case law). The *Prestige* court held that the only effect of the endorsement was to "delete[ ] limiting clauses in the policy to which it is attached, but it does not create new, additional obligations in the policy, nor does it purport to limit or delete clauses in other policies issued by other insurance companies that may also have contractually assumed primary liability for the risk involved." *Id.* at 1349 (quoting *Zurich–American Ins. Co. v. Amerisure Ins. Co.*, 215 Mich.App. 526, 547 N.W.2d 52, 58 (1996)). Again, the *Prestige* court was considering "which of two insurance companies must provide primary coverage for liability arising out of a [motor vehicle accident]." *Prestige*, 99 F.3d at 1342.

19. Although *Prestige* controls in this Circuit, even though it is the minority view on the issue which it addressed, that case nonetheless has *no* application here, where the dispute is not about allocating loss among insurers.

[endorsement] is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers.") (quoting *John Deere Ins. Co. v. Nueva,* 229 F.3d 853, 857 (9th Cir. 2000), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1063, 151 L.Ed.2d 967 (2002)).[20]

The MCS–90 endorsement provides that the insurer agrees to pay "any *final judgment* recovered against the insured *for public liability* resulting from negligence in the operation, maintenance or *use of motor vehicles subject to the financial responsibility requirements* of Sections 29 and 30 of the Motor Carrier Act of 1980[.]" Doc. No. 57 (emphases added). It also reiterates that this payment "is afforded[ ] *for public liability,* [and] *does not apply to* injury to or death of the *insured's employees* while engaged in the course of their employment[.]" *Id.* (emphases added). Finally the endorsement specifies that "[t]he insured agrees to reimburse the [insurer] for any payment made by the [insurer] ... [which it] would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement." *Id.*

Plaintiffs' argument that this endorsement turns the indemnity policy into an automobile liability policy is clearly meritless. In the first place, although under the endorsement ISOP is initially required to pay, Preston would be required to reimburse any payment that would not have otherwise been required under the policy. This fact makes even stronger the Court's view that the Program is a single self-insurance policy.

Finally, if this Court were to find that, because of the MCS–90 endorsement, the indemnity policy is really a motor vehicle liability policy, so that UM/UIM coverage is impressed upon it by operation of law, White, an employee of Preston, would arguably be able to recover from *Preston* (who under the terms of the MCS–90 would be obligated to reimburse ISOP) what he could not otherwise recover due to worker's compensation immunities. This turns insurance contract law on its head.[21]

---

**20.** It must further be noted that the *Prestige* court's position is the minority view held by only one other court. *See Empire Fire and Marine Ins. Co. v. Guaranty Nat. Ins. Co.,* 868 F.2d 357, 361–64 (10th Cir.1989) (holding that a policy with the endorsement is primary, but will be co-primary with other policies that are also primary but do not have the endorsement).

The majority view, expressed in *Canal Ins. Co.,* 320 F.3d at 493, is that the MCS–90 Endorsement "does not apply to determine the allocation of loss among insurers." *See also T.H.E. Ins. Co. v. Larsen Intermodal Serv., Inc.,* 242 F.3d 667, 673 (5th Cir.2001); *Empire Fire & Marine Ins. Co. v. J. Transport, Inc.,* 880 F.2d 1291, 1298–99 (11th Cir.1989); *Occidental Fire & Cas. Co. of N.C. v. Int'l Ins. Co.,* 804 F.2d 983, 986 (7th Cir.1986); *Grinnell Mut. Reinsurance Co. v. Empire Fire & Marine Ins. Co.,* 722 F.2d 1400, 1404 (8th Cir.1983); *Carolina Cas. Ins. Co. v. Insurance Co. of North Am.,* 595 F.2d 128, 140–41 (3d Cir.1979). The rationale behind the majority view is that the purpose of the endorsement is to protect the public, not insurers. *See T.H.E. Ins. Co.,* 242 F.3d at 673 (the endorsement "is not implicated for the purpose of resolving disputes among multiple insurers over which insurer should bear the ultimate financial burden of the loss.").

**21.** In *Tope v. Pamco. Inc.,* No. 93AP–11, 1993 WL 308436, *6 (Ohio App. 10 Dist. July 27, 1993), the court expressly held

that R.C. 3937.18 does not apply to require underinsured motorist coverage because the financial responsibility bond (whether under the financial responsibility statute found in R.C. Chapter 4509, or Sections 29 and 30 of the Motor Carrier Act of 1980 found in Section 10927, Title 49, U.S.Code) does not create liability *insurance.* R.C. 3937.18 requires that underinsured motorist coverage be offered with each "motor vehicle liability policy of insurance." As the MCS–90 is not insurance, it need not provide underinsured motorist coverage.

Accordingly, the Court concludes that there is no UM/UIM coverage available to the plaintiffs. For that reason, defendant is entitled to summary judgment and plaintiffs' cross-motion must be denied with respect to the insurance claims.

### 2. The Loss of Consortium Claims

■ Because there is no UM/UIM coverage for Terry White, the loss of consortium claims, which are derivative, must also be rejected. Further, even if Terry White's claims survived, these derivative claims would be barred by the statute of limitations.[22]

In *Stover v. State Farm Ins. Co.*, 127 Ohio App.3d 590, 713 N.E.2d 505 (Ohio App.1998), the Third District Court of Appeals of Ohio addressed a situation where a wife was not with her husband when he was injured in an automobile accident. As a result, she had only a loss of consortium claim, that is, a personal injury claim not arising under the insurance contract itself but derivative of her husband's contractual claim for UM/UIM coverage. The court noted that, although a person has fifteen (15) years to file a claim for UM/UIM coverage under an insurance contract, "the insurance policy 'is not intended to establish what type and to what extent damages should be recoverable.'" *Id.* at 594, 713 N.E.2d 505 (quoting *Nationwide Ins. Co. v. Fryer*, 62 Ohio App.3d 905, 908, 577 N.E.2d 746 (1990)). Under Ohio law, "for an injury to the rights of the plaintiff not arising on contract," the statute of limitations is four (4) years. O.R.C. § 2305.09(D). Further, "a cause of action

... accrues, and the limitations period begins to run, when the violation giving rise to liability occurs[.]" *Id.* (citing *Lane v. Grange Mut. Cos.*, 45 Ohio St.3d 63, 65, 543 N.E.2d 488 (1989); O.R.C. § 2305.09(D)). Here, the relevant event occurred on or about August 6, 1997. The instant lawsuit was served on April 30, 2002, outside the four-year period.

In *Lanthorn v. Cincinnati Ins. Co.*, No. 02CA743, 2002 WL 31768796 (Ohio App. 4 Dist. Dec. 5, 2002), the Fourth District Court of Appeals of Ohio discussed a similar situation where a mother claimed a right to UM benefits under an insurance policy for her loss of consortium with respect to her daughter who had been injured in a car accident. The trial court had determined that the mother was not "legally entitled to recover" under the policy because her loss of consortium claim was time-barred even though the contract claim for UM benefits was not. The court of appeals affirmed, stating:

> In order to determine whether appellant is "legally entitled to recover" for her loss of consortium claim, we must examine whether appellant possesses a valid cause of action for her loss of consortium claim. Thus, this inquiry requires an examination of the statute of limitations regarding consortium claims. If the statute of limitations bars appellant's consortium claim, she is not "legally entitled to recover" and appellee possesses no obligation to pay under its UM policy provisions. *See Stover* (concluding that although the plaintiff initiated

---

**22.** ISOP has not raised a limitations defense in its motion where it argues only that, even if UM/UIM coverage is available to Terry White under the Preston Program, he is the only "insured" and none of the other plaintiffs can recover. In ISOP's answer to the complaint, it also did not raise a statute of limitations defense, although it did raise the doctrine of laches and further reserved the right to amend its answer to assert additional defenses. Given the liberality typically afforded amendment of pleadings, the Court is of the view that ISOP's answer could easily be amended, without prejudice to the plaintiffs, to add a defense of statute of limitations. Therefore, the Court believes it is operating within its discretion by sua sponte raising this issue.

complaint against insurer for underinsured motorist coverage to compensate her for loss of consortium within the fifteen-year statute of limitations for a contract, the plaintiff was not entitled to UIM coverage because she was not "legally entitled to recover" when the statute of limitations for her loss of consortium claim as against the tortfeasor had expired).

*Id.* at *3, ¶ 20.

Accordingly, even if this Court is wrong in its conclusion that Terry White's UM/UIM coverage claim must fail, rendering the derivative claims moot, it would nonetheless determine that the loss of consortium claims are all barred by the four-year statute of limitations in O.R.C. § 2305.09(D).

### IV. CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment (Doc. No. 34) is DENIED. Defendant's motion for summary judgment (Doc. No. 31) is GRANTED to the extent that it seeks a declaratory judgment that the plaintiffs are not entitled to coverage under the Preston Risk Management Program. Finally, the loss of consortium claims set forth in Count III through VI are dismissed as barred by the statute of limitations. Count VII, which raises a claim in anticipation of a defense that was not made, is dismissed as moot.

IT IS SO ORDERED.